UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


COREY SCALES,

        Petitioner,

v.                                  Case Number: 05-CV-74914
                                       Honorable Nancy G. Edmunds

ANDREW JACKSON,

        Respondent.

_____/


**OPINION AND ORDER DENYING
PETITION FOR WRIT OF HABEAS CORPUS**


**I. Introduction**

Petitioner Corey Scales, a state inmate currently incarcerated at the Mound Correctional

Facility in Detroit, Michigan, has filed a *pro se* petition for a writ of habeas corpus, pursuant to

28 U.S.C. § 2254, alleging that he is incarcerated in violation of his constitutional rights.

Petitioner was charged with (1) two counts of first-degree premeditated murder, MICH. COMP.

LAWS § 750.316(1)(a), (2) two counts of first-degree felony murder, MICH. COMP. LAWS

§ 750.316(1)(b), (3) one count of armed robbery, MICH. COMP. LAWS § 750.529, (4) one count of

assault with intent to murder, MICH. COMP. LAWS § 750.83, and (5) one count of possession of a

firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b. A Wayne County,

Michigan, Circuit Court jury convicted Petitioner of armed robbery and returned not guilty

verdicts on all of the other counts. The trial court in this case departed from the sentencing

guidelines range of 109 to 180 months and sentenced Petitioner to a term of life imprisonment.


Subsequently, Petitioner filed his appeal as of right with the Michigan Court of Appeals,

which affirmed his conviction but remanded for re-sentencing before a different judge.  On

remand, Petitioner was re-sentenced to fifteen-to-thirty-years imprisonment.

On December 29, 2005, while his appeal from his re-sentencing was pending in the

Michigan Court of Appeals, Petitioner filed this habeas petition.  On November 28, 2006, the

Michigan Court of Appeals denied Petitioner's appeal from re-sentencing.  The Michigan

Supreme Court subsequently denied Petitioner's application for leave to appeal that decision on

April 24, 2007.  Following those decisions, Petitioner filed a motion to amend his petition to

include the claims raised those appeals, which this Court granted.  Respondent filed a

supplemental response on August 16, 2007.

Petitioner is now challenging his state conviction and sentence on the following grounds:

(1) trial court error in failing to instruct the jury on the defense of abandonment, and, (2) a

*Blakely v. Washington*[1] violation.  For the reasons stated below, the Court denies the petition.

## II.  Substantive Facts

This case arises from a incident that occurred on October 15, 2001, in Detroit, Michigan,

where twenty-three-year-old Antonio Hall and twenty-year-old Damon Hill died of gunshot

wounds to the head.  Hill died of a single gunshot wound to the forehead caused by a gun that

had been fired at close range, and Hall suffered gunshot wounds to the left side of his head and

his left finger.  The medical examiner, Boguslaw Pietak, testified that the trajectory of the bullets

that killed both men were downward, which is consistent with the fact that the victims were on

their knees when they were shot.  The medical examiner also testified that the injury to Hall's

---

[1]542 U.S. 296 (2004).

hand was consistent with his defensive action.

Petitioner was initially bound over for trial, along with co-defendant, Don Perkins, on the above-stated charges. Petitioner and Perkins were tried separately. As stated above, at the conclusion of his trial, Petitioner was acquitted of all of the charges except for the armed-robbery charge.

The prosecution's theory in the case was that Petitioner was involved, along with two or three other men, in a plan to rob and kill three men, who were planning to engage in a drug transaction. As a result of that plan, Hill and Hall were shot and killed, and the third man, Maurice Odums, was shot at but not injured. The defense's theory was that Petitioner was present at the time of the incident and had agreed to act as a back-up to a planned breaking and entering but was not involved in any plan to rob or kill anyone. According to the defense, Petitioner did not shoot at Odums. Rather, Petitioner abandoned his back-up role as soon as he heard the gunshots.

Prior to trial, the defense moved to suppress evidence of a custodial statement given by Petitioner to the police subsequent to his arrest. A hearing was held and the trial court ruled that the statement was admissible.

Trial in this case began on May 6, 2002. Odums, who was sixteen-years-old at the time, testified first. He said that he was a friend of both Hill and Hall. According to Odums' testimony, on the night in question, he, along with Hill and Hall, went to a restaurant to eat. It was his testimony that, while there, he saw Hall was carry a large sum of money. Odums testified that, after eating, they left the restaurant and went to a residence on Rosemary Street in Detroit, Michigan, where Hill's aunt lived. Odums said that subsequently they left Hill's aunt's

house and went to a house located on Spring Garden Street. Despite an objection from defense counsel, Odums testified that Hall wanted to go to that house to sell marijuana. He testified that it was his belief that Hall wanted to sell about one pound of marijuana and that he (Hall) was carrying a book bag when they got out of the car on Spring Garden Street.

According to Odums' testimony, when the three men walked to the rear of the Spring-Garden house, they were accosted by three other men, who were armed with guns. Odums said that he was able to see the men because there were two lights in the backyard that permitted him to do so. Odums identified Petitioner as one of the men and said that he was carrying a revolver at the time. Odums testified that the other assailants had an automatic handgun and a black handgun. It was his testimony that he was within ten feet of Petitioner and his view of him was unobstructed; he said that Petitioner was wearing a gray sweatshirt and a stocking cap. Odums said that neither he nor the other two men (Hall and Hill) were armed with weapons at the time.

It was Odums' testimony that he dropped a bag containing juice and pop when he saw the guns. He said that Hall was standing on his right and Hill on his left, when a man emerged from under the stairs and said "be quiet, don't run." (Trial Tr. vol. I, 104, May 6, 2002.) Odums testified that Hall said, "they can take whatever they wanted, just don't shoot him." (Trial Tr. vol. I, 109, May 6, 2002.)

According to Odums, about thirty seconds after the men came up to them, he heard some shots and, after hearing those shots, he ran from the backyard. It was his testimony that he ran through the yard, through the gate in the fence, and down an alley. Odums said that he heard numerous gunshots as he was running down the alley, where he then saw a Detroit police officer, who stopped him. The police officer patted him down and placed him in the squad car. Odums

testified that approximately two or three minutes later, he saw Petitioner walking out of the alley, and told the police that Petitioner was one of the men, with a gun, who was in the backyard. According to Odums, he then witnessed the police arresting Petitioner.

On cross-examination, Odums acknowledged that he did not see any actual marijuana that night. When he was shown his testimony from the preliminary examination, he admitted that he did see some bags of marijuana in the book bag but did not think it was a pound. Neither Odums' statement to the police on the night in question nor his testimony at the two preliminary examinations in this case ever mentioned that he and the other men went to a restaurant, or that he saw the quantity of money. Odums admitted on cross-examination that he gave a description of the size of, and the clothing of, the man that he later identified as Petitioner but told the police that he did not see that man's face. Odums agreed that he had seen Petitioner in an elevator at the police headquarters and, later that day, he testified that he gave a statement to the police, describing the man in the elevator.

According to Odums' cross-examination testimony, he agreed that he was very scared during the incident. He acknowledged that he could only describe one of the guns that he saw but insisted that all three of the men involved were armed. Odums also acknowledged that during the thirty-second period in the backyard, he was looking at all three men and also looking around to find a way that he could escape. It was his testimony that as he was running down the alley, he heard someone running behind him, turned briefly to look, saw that person but could not identify that person.

Artimeyo Folks, who was in the area during the incident visiting his son and his mother,

testified next.  According to Folks' testimony, he was sitting in his car, next door to the house where the shooting incident occurred, when he heard three gunshots.  Folks testified that he then saw a young man run from the side of the house.  He was unable to identify that man but described him as wearing a gray-like jacket and dark pants.

Detroit Police Officer Dean Muczynski testified that he and his partner, Ryan May, were sitting in a scout car doing a surveillance on a possible stolen car, when they heard the gunshots.  According to Officer Muczynski's testimony, after they heard the shots, they exited the squad car, looking for where the shots may have come from, when they saw Odums come running out of the alley.  Officer Muczynski testified that he then detained Odums, who told him that his cousins were in the area and that there had been a shooting.  It was Officer Muczynski's testimony that, as he placed Odums in the squad car, he heard more gunshots.  Shortly afterward, Officer Muczynski said that he saw Petitioner come running out of the alley and then slow down to a walk.  At that point, Odums told the police that Petitioner was one of men involved in the shooting.  Officer Muczynski then went to speak with Petitioner.

Subsequently, Officer Muczynski arrested Petitioner.  He testified that he did not see any blood on Petitioner.  He also said that he did not have any knowledge of finding any money or bags of marijuana on Petitioner following his arrest.  According to Officer Muczynski's testimony, the alley was only one lot away from the house where the shooting occurred.

Officer May testified next.  His testimony corroborated that of Officer Muczynski.  According to Officer May's testimony, once he heard the shots, he ran through the alley, looking for where they (the shots) were coming from.  Officer May said that, while running through the alley, he first saw Odums, and then Petitioner.  Officer May testified that he heard a second

round of shots at the time he saw Odums coming from the alley, and, about five to ten seconds after he heard the second round of shots, he saw Petitioner exiting the alley. According to Officer May, when he got to the Spring-Garden address, he saw two men lying in the backyard.

Both police officers testified that they did not find any money on Hill when his clothes were examined at the hospital; however, a postal scale was found in his clothing, and five one-dollar bills were found in the clothing of Hall. The police officers testified that no marijuana or weapons were found on either Hill or Hall.

Julia Mosely testified next. She said that she was at the house on Spring Garden Street with her cousin, Tiffany Hopkins, on the day of the shooting. While there, Mosely testified that she heard a number of gunshots. She said that her cousin had told her earlier that evening that she (Hopkins) was expecting her boyfriend, Antonio, to come over that night.

Over an objection by the defense, the prosecution was permitted to read into evidence a statement that Mosley gave to the police on the night in question. In that statement, Mosely told the police that she heard "Boone" at about the same time that she heard the shots. Mosely said that "Boone" was the nickname for Antonio's friend, Damon. According to Mosely, she said that she heard Damon's voice coming from the side of her cousin's house but could not tell what was being said. She testified that she did not hear any other voices at the time.

Police Officer Antonio Trupiano testified that it was his job to collect the victims' property and clothing from the hospital. He testified that Hill had an identification card and electronic postal scale but no money. Hall had five one dollar bills. Officer Trupiano said he did not find any marijuana or guns on or with the victims.

Detroit Police Officer William Niarhos, from the Evidence Department, testified that he

arrived at the scene about 1:00 a.m., along with his partner, Frank Horan. According to Officer

Niarhos' testimony, they found two spent .45 caliber casings, and one live round, near blood

spots on the driveway but they did not find any weapons. A ballistics expert testified that the

two .45 caliber casings had been fired from the same gun. The spent .45 caliber bullet was

compatible with those casings.

The police also found a child's backpack near the spent casings. The bag contained

ninety-four small ziplock bags of marijuana, weighing a total of 227.8 grams. A torn paper bag

containing two unopened bottles of juice and one unopened bottle of Pepsi was found behind the

house. In the alley, the police also found a knit cap.

The evidence technicians collected samples from Odums and Perkins for the purpose of

gunshot-residue testing. Hayden Dannug, a police chemist and one of the technicians, testified

that one particle of gunshot residue was detected in the sample taken from Odums' forehead and

face. However, Dannug testified that he was unable to draw any conclusions on the basis of such

a small quantity. He said that the samples taken from Petitioner and Perkins did not contain any

gunshot residue but that those results did not mean that they did not fire guns because gunshot

residue is easily removed.

Petitioner waived his *Miranda*[2] rights and signed a written waiver of constitutional rights

form on October 16, 2001. Sergeant Joann Kinney of the Detroit Police testified concerning the

custodial statement taken from Petitioner. It was her testimony that Petitioner was very

cooperative and willing to talk to her about the situation. According to Sergeant Kinney, she

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

was the officer who initially interviewed Petitioner; she said the questioning took about three hours.

Frank Sparks, a friend of Hill and Hall, testified that he was with them, and Odums, on the night in question. He said that the four of them went to the address on Spring Garden Street before going to the restaurant, and that while at the restaurant, Hall had a conversation with a man about the possible sale of marijuana. Despite an objection by defense counsel, Sparks was permitted to testify that the man told Hall he was not ready to make the purchase and asked him (Hall) to come back in about thirty minutes.

According to Sparks' testimony, after that conversation, the four of them then drove to a house on Rosemary Street, where Hall put the bag containing the marijuana in Sparks' car, and they then returned to the restaurant. It was Sparks' testimony that while they were at the restaurant, he saw Hill counting what appeared to be a large sum of money, and he saw Hall with a stack of money so thick that he (Hall) had difficulty removing it from his pocket. It was Sparks' testimony that they then returned to Rosemary Street, where they retrieved the book bag from Sparks' car. Sparks testified that, at about 10:30 p.m., that night, they (Hill and Hall) then dropped him off at his house. According to Sparks, he split off from the men and did not return with them to the address on Spring Garden Street.

Sergeant James Fleming testified that he conducted the interview of Petitioner and ultimately prepared a typewritten statement that Petitioner reviewed and signed. According to Sergeant Fleming, Petitioner told him that, on the night in question, he was with two men named, Delano Harper and Jamal Warwick, that they dropped off Harper, and that he was on his way to drop off Warwick when Warwick asked him to "watch their backs while they do a lick." (Trial

Tr. vol. III, 8, May 8, 2002.)  It was Sergeant Fleming's testimony that Petitioner told him that Warwick then went to speak to two other men, whom he (Petitioner) did not know.  Sergeant Fleming said that Petitioner told him that the four of them got into another car and drove to Spring Garden Street.  He said that Petitioner said that once they were at the house on Spring Garden Street, the two men went up the driveway, and that he (Petitioner) and Warwick walked up the driveway of the house next door and stood in the backyard by the gate.  Sergeant Fleming testified that Petitioner said that while they were standing there, a car pulled into the driveway of the house and some men got out of the car and walked up the driveway.  Petitioner told Sergeant Fleming that he then heard some commotion and some gunshots, at which point he said he ran.

It was Sergeant Fleming's testimony that Petitioner told him that when he heard more shots, he ran to Peoria Street and hid in some bushes, and that when the shots ended, he walked out of the alley and that is when he then came into contact with a police officer.  Petitioner said that the first police officer asked him if he had heard shots and that he replied that he had.  He then said that a second police officer then called him over to a squad car and arrested him.

Petitioner told Sergeant Fleming that the first time he heard about anyone planning a "lick" was when Warwick met with the other two men.  (Trial Tr. vol. III, 10, May 8, 2002.) Petitioner said that he heard them talking about breaking into a house.  Petitioner denied having a gun or seeing Warwick with a gun.  However, Petitioner said that he saw one of the other men with a .45 automatic.  He said that both men were dressed in all black with black skull caps. Petitioner said that he was wearing gray clothing that day.  He also told Sergeant Fleming that he heard approximately two and four gunshots.

Subsequently, Sergeant Fleming talked to Petitioner again on October 18, 2001. At that time, he showed Petitioner a photograph, which Petitioner identified as Warwick Petitioner said that he had known Warwick since middle school.

The only evidence presented by the defense was testimony from one of the evidence technicians, who was recalled to testify about a drawing that had been made of the area around the Spring-Garden-Street address. The defense then rested. There were no rebuttal witnesses.

Following the trial court's instructions to the jury, Petitioner's counsel objected to the substance of the aiding and abetting instruction and requested that the trial court instruct the jury on the defense theory of abandonment. The trial court denied the request.

The jury convicted Petitioner of armed robbery and returned not guilty verdicts on the remaining counts.

On May 29, 2002, the trial court sentenced Petitioner to life imprisonment. At sentencing, the trial court recited its interpretation of the evidence presented at trial and concluded that Petitioner "[was] just as guilty as the shooter or shooters, if he is not the shooter himself. And it doesn't make any difference." (Sentence Hr'g Tr. p. 15, May 29, 2002.) Further the trial court stated that "[a]nd I don't feel constrained by any findings of the jury as to what my sentence is going to be," and concluded by stating that "[t]he [trial court] is going to completely ignore the guidelines." (Sentence Hr'g Tr. pp. 14-15, May 29, 2002.)

Subsequently, Petitioner appealed as of right to the Michigan Court of Appeals, alleging the following:

> I.  The trial court reversibly erred in refusing a defense request to instruct the jury on the defense of abandonment, as the trial court record sufficiently supported that request and the denial violated [Petitioner's] constitutional right to present a defense.

> II.  [Petitioner] is entitled to be re-sentenced, before a different judge, where the trial court (A) intentionally disregarded the recommendation of the sentencing guidelines and failed to state substantial and compelling reasons for the significant deviation above that recommended range; and (B) erroneously assumed [Petitioner] to be guilty of the homicide counts in the case, on which he was acquitted by the jury, in violation of [Petitioner's] Sixth and Fourteenth Amendment rights.

Petitioner also filed a motion for peremptory re-sentencing. On December 4, 2003, the Michigan Court of Appeals issued an order denying Petitioner's motion. *People v. Scales*, No. 246411 (Mich.Ct.App. Dec. 4, 2003). Then, on May 18, 2004, the Michigan Court of Appeals affirmed Petitioner's conviction but remanded for re-sentencing before a different judge. *People v. Scales*, No. 246411, 2004 WL 1103896 (Mich. Ct. App. May 18, 2004).

Following, in July 2004, the People filed an application for leave to appeal that decision with the Michigan Supreme Court. Petitioner also filed an application for leave to appeal, raising the same claims as raised in the Michigan Court appeals. On September 28, 2004, the Michigan Supreme Court denied the People's application for leave to appeal, and denied Petitioner's application for leave to cross-appeal. *People v. Scales*, 471 Mich. 886; 688 N.W.2d 506 (2004).

On March 15, 2005, the trial court, with a different judge presiding, re-sentenced Petitioner to fifteen-to-thirty-years imprisonment for the armed-robbery conviction. The sentencing guidelines for the minimum sentence were calculated at nine to fifteen years.

Then, in May 2005, Petitioner filed a claim of appeal regarding his re-sentencing, raising the following:

> I.    [Petitioner] is entitled to re-sentencing under the United States Supreme Court's recent decision in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and the Sixth and Fourteenth Amendments of the United States Constitution, within a guidelines range that does not assess any points for offense variables, and alternatively, because the guidelines were mis-scored.

On November 28, 2006, the Michigan Court of Appeals issued an unpublished *per curiam* opinion denying Petitioner's appeal. *People v. Scales*, No. 262791, 2006 WL 3421768 (Mich.Ct.App. Nov. 28, 2006) (unpublished). Petitioner subsequently filed an application for leave to appeal that decision in the Michigan Supreme Court, raising the same claims as raised in his Michigan Court of Appeals' appeal. On April 24, 2007, the Michigan Supreme Court denied Petitioner's application. *People v. Scales*, 477 Mich 1115, 729 N.W.2d 842 (2007).

Petitioner filed the pending petition for a writ of habeas corpus on December 29, 2005, raising the following claim:

> I.    The trial court reversibly erred in refusing a defense request to instruct the jury on the defense of abandonment, as the trail record sufficiently supported that request and the denial violated [Petitioner's] right to present a defense.

At the time that Petitioner filed his habeas action, his appeal following his re-sentencing was pending in the Michigan Court of Appeals. As noted above, the Court of Appeals denied his

appeal on November 28, 2006, and the Michigan Supreme Court denied his application for leave to appeal on April 24, 2007. In May 2007, Petitioner filed a motion to amend his habeas petition to include the claims raised in his claim of appeal filed after his re-sentencing. This Court granted Petitioner's motion, and issued an order directing Respondent to file a supplemental response, which Respondent did on August 16, 2007.

In his amended petition, Petitioner raised the following claim:

> I.      Petitioner is entitled to re-sentencing under the United States Supreme Court's recent decision in *Blakely v. Washington*, 542 U.S. 296 (2004), and the Sixth and Fourteenth Amendments to the United States Constitution, within a guidelines range that does not assess any points for offense variable, or alternatively, because the guidelines were misscored.

### III. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this court's habeas corpus review of state-court decisions. Specifically, 28 U.S.C. § 2254(d) states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

Under (d)(1), a federal court may grant a writ of habeas corpus under two different clauses, both of which provide two bases for relief. Under the "contrary to" clause, a federal court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The words "contrary to" should be construed to mean "diametrically different, opposite in character or nature, or mutually opposed." *Id.*

Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts. *Williams*, 529 U.S. at 407-08. Relief is also available under this clause if the state-court decision either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407; *Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state[-]court decision was "objectively unreasonable" and not simply erroneous or incorrect. *Williams*, 529 U.S. at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

In analyzing whether a state-court decision is "contrary to" or an "unreasonable application" of clearly established Supreme Court precedent, a federal court may only look to the holdings, as opposed to dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003); *Williams*, 529 U.S. at 412.

With that standard in mind, the Court proceeds to the merits of the petition for a writ of

habeas corpus.

## IV.  Analysis

## A.  Claim I–Jury Instruction Claim

In his first claim, Petitioner alleges that the trial court erred in refusing a defense request to instruct the jury on the defense of abandonment, thereby denying him his right to present a defense.  Respondent argues that this claim is without merit or not cognizable in this Court.

In order for habeas-corpus relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Hardaway v. Withrow*, 305 F.3d 558, 565 (6th Cir. 2002).  Thus, "only of 'the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' can [the federal habeas] court grant a writ."  *Baze v. Parker*, 371 F.3d 310, 327 (6th Cir. 2004), *cert. denied*, 544 U.S. 931 (2005) (quoting *Kibbe*, 431 U.S. at 154).  The Supreme Court noted in *Estelle* that "we also bear in mind our previous admonition that we 'have defined the category of infractions that violate fundamental fairness very narrowly.'" *Estelle*, 502 U.S. at 72-73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

Despite this difficult standard of review, a jury instruction will not withstand scrutiny if it submits alternative theories for the jury to convict, one of which is permissible and the other unconstitutional, and the reviewing court cannot determine on which theory the jury relied.  *Zant v. Stephens*, 462 U.S. 862, 880-83 (1983); *United States v. Palazzolo*, 71 F.3d 1233, 1235-38 (6th Cir. 1995).  If an instruction is ambiguous and not necessarily erroneous, it runs afoul of the

Constitution only if there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. *Estelle*, 502 U.S. at 72-73, n.4. State law instructional errors rarely form the basis for federal-habeas-corpus relief. *Id.* at 71-72.

Petitioner alleges that the trial court's failure to give the jury an instruction on the defense of abandonment denied him his constitutional right to present a defense.

"A fair opportunity to present a defense is a constitutional right." *Baze*, 371 F.3d at 323. The failure to give a defense-theory instruction that is supported by the evidence does not automatically entitle a petitioner to habeas relief; the failure to instruct must have rendered the petitioner's trial fundamentally unfair. *See Maes v. Thomas*, 46 F.3d 979, 984-85 (10th Cir.1995); *Nickerson v. Lee*, 971 F.2d 1125, 1137 (4th Cir.1992). Thus, a failure to instruct does not deprive a petitioner of fundamental fairness where the instructions as a whole adequately present the defense theory to the jury. *See Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir.1995). As the Supreme Court has noted, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Kibbe*, 431 U.S. at 155.

Where the jury instructions as a whole adequately convey the defense theory of the case to the jury, a petitioner is not entitled to habeas relief based on the trial court's failure to give a specific instruction. *Aldrich v. Bock*, 327 F.Supp.2d 743, 766 (E.D.Mich. 2004); *see, e.g., Rodriguez v. Young*, 906 F.2d 1153, 1166 (7th Cir. 1990) (habeas relief not warranted where "the instructions finally given to the jury adequately addressed the [Petitioner's] theory in a general way, even if not as specifically as [he] would have liked," and the instructions, "considered together, and along with counsel's argument and cross examination . . . should have reasonably conveyed to the jury [Petitioner's] theory of the case."); *Conner v. Director of Div. of Adult*

*Corrections, State of Iowa*, 715 F.Supp. 925, 934 (N.D. Iowa 1987), *aff'd*, 870 F.2d 1384, 1388

(8th Cir. 1989); *cf. United States v. Dees*, 34 F.3d 838, 842 (9th Cir. 1994) (on direct review of

criminal conviction, "[i]t is not reversible error to reject a defendant's proposed instruction on

his theory of the case if other instructions, in their entirety, adequately cover that defense

theory").

In this case, the Michigan Court of Appeals, the last court to issue a reasoned decision in

this case, stated in pertinent part:

> Defendant's only challenge to his conviction is that the trial
> court erred in refusing to instruct the jury on the defense of
> abandonment. We disagree. Claims of instructional error are
> reviewed de novo. *People v. Perez*, 469 Mich. 415, 418; 670
> NW2d 655 (2003).
>
> In *People v. Kimball*, 109 Mich.App. 273; 311 NW2d 343
> (1981), modified 412 Mich. 890 (1981), this Court recognized that
> "voluntary abandonment is an affirmative defense to a prosecution
> for criminal attempt." *Id.* at 286. Here, defendant was not charged
> with criminal attempt, but rather completed offenses.
> Consequently, defendant was not entitled to an abandonment
> instruction.

*Scales*, No. 246411, 2004 WL 1103896, slip op. at 1.

This Court agrees and finds that the Michigan Court of Appeals' decision is

consistent with Supreme Court precedent and constitutes a reasonable application thereof. The

jury instructions as a whole were adequate to protect Petitioner's rights. The jury was properly

instructed. Petitioner therefore has not established that the trial court's failure to instruct the jury

on the defense of abandonment rendered his trial fundamentally unfair.

Moreover, the jury instructions adequately covered Petitioner's defense theory and

protected his rights by requiring that the jury find the intent elements of armed robbery and first

and second-degree murder proven beyond a reasonable doubt.  The jury acquitted Petitioner of the murder charges and found him guilty only on the armed-robbery charge.  Thus, the jury must have accepted some sort of Petitioner's theory of abandonment based on the evidence heard and the instructions given.  The Michigan Court of Appeals' findings as to the jury instructions was not contrary to, or an unreasonable application of, clearly established federal law so as to entitle Petitioner to habeas relief.  Accordingly, the Court concludes that Petitioner is not entitled to habeas relief on his jury-instructional-error claim.

### B.  Claim II–Sentencing Claim

In his next claim, Petitioner alleges that he was entitled to re-sentencing under *Blakely*, and that certain offense variables were mis-scored.  These claims are not cognizable upon federal-habeas review and are without merit.

In support of this claim, Petitioner relies on *Blakely*, *supra*, in which the United States Supreme Court held that other than the fact of a defendant's prior conviction, any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt.  *Id.* at 301 ( citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

The problem with Petitioner's reliance on *Blakely* is that the case in *Blakely* involved a trial court's departure from Washington's determinate sentencing scheme.  Michigan, by contrast, has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum sentence.  The maximum sentence is not determined by the trial judge but is set by law.  *See People v. Drohan*, 475 Mich. 140, 160-61, 715 N.W.2d 778 (2006); *cert. denied*, *sub nom*, *Drohan v. Michigan*, ___U.S. ___, 127 S.Ct. 592, 166 L.Ed.2d 440

(2006); *People v. Claypool*, 470 Mich. 715, 730, n. 14, 684 N.W.2d 278 (2004) (both citing

MICH. COMP. LAWS § 769.8). "[M]ichigan's sentencing guidelines, unlike the Washington

guidelines at issue in *Blakely*, create a range within which the trial court must set the minimum

sentence." *Drohan*, 475 Mich. at 161, 715 N.W.2d 778. Under Michigan law, only the

minimum sentence must presumptively be set within the appropriate sentencing guidelines

range. *See People v. Babcock*, 469 Mich. 247, 255, n. 7, 666 N.W.2d 231 (2003) (citing MICH.

COMP. LAWS § 769.34(2)). Under Michigan law, the trial judge sets the minimum sentence but

can never exceed the maximum sentence. *Claypool*, 470 Mich. at 730, n. 14, 684 N.W.2d 278.

Michigan's indeterminate sentencing scheme is therefore unaffected by the United States

Supreme Court's holding in *Blakely*. *Drohan*, 475 Mich. at 164, 715 N.W.2d 778.

 The decision in *Blakely* has no application to Petitioner's sentence. Indeterminate

sentencing schemes, unlike determinate sentencing schemes, do not infringe on the province of

the jury. *See Blakely*, 542 U.S. at 304-05, 308-09. Because *Apprendi* and *Blakely* do not apply

to indeterminate sentencing schemes like the one used in Michigan, the trial court's calculation

of Petitioner's sentencing guidelines range did not violate Petitioner's Sixth Amendment rights,

so as to entitle him to habeas relief. *See Worley v. Palmer*, 2006 WL 2347615 (E.D.Mich. Aug.

11, 2006); *Toothman v. Davis*, 2006 WL 2190515 (E.D.Mich. Aug. 1, 2006).[3] *See also People v*

_____

 [3]Indeed, every judge in the Eastern District of Michigan that has considered the issue has
also rejected *Blakely* challenges to the scoring of the Michigan Sentencing Guidelines on this
basis. *See Delavern v. Harry*, No. 07-13293, 2007 WL 2652603 (E.D.Mich. Sept. 7, 2007)
(Rosen, J.); *Brown v. Bell*, No. 06-15132, 2007 WL 2516933 (E.D.Mich. Aug. 31, 2007) (Cohn,
J.); *Anderson v. Lafler*, No. 06-11945, 2007 WL 2480549 (E.D.Mich. Aug. 29, 2007) (Borman,
J.); *Couch v. Prelesnik*, No. 05-70591, 2007 WL 2413090 (E.D.Mich. Aug. 21, 2007) (Friedman,
J.); *Morgan v. Birkett*, No. 07-12396, 2007 WL 2318751 (E.D.Mich. Aug. 9, 2007) (Hood, J.);
*Moffett v. Davis*, No. 06-13946, 2007 WL 2225875 (E.D.Mich. Aug. 1, 2007) (Roberts, J.);
*Logan v. Booker*, No. 06-14240, 2007 WL 2225887 (E.D.Mich. Aug. 1, 2007) (Duggan, J.);

*McCuller*, 479 Mich 672, 739 N.W.2d 563 (2007), *cert. denied*, *McCuller v. Michigan*, ___ U.S. ___, 128 S.Ct. 1871, 170 L.Ed.2d 751 (2008).

Petitioner also claims that the trial court incorrectly scored his sentence under the Michigan sentencing guidelines. This claim does not entitle Petitioner to habeas relief. As a general matter, a habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987). Federal-habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle*, 502 U.S. at 67-68; *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). Petitioner's claim that the trial court improperly scored the guidelines range raises an issue of state law not cognizable on habeas review. *See Cook v. Stegall*, 56 F.Supp.2d 788, 797 (E.D.Mich. 1999) (Gadola, J.) (claim that sentencing court departed from Michigan sentencing guidelines presents an issue of state law only and is, thus, not cognizable in federal-habeas review); *Welch v. Burke*, 49 F.Supp.2d 992, 1009 (E.D.Mich. 1999) (Cleland, J.) (same); *see also*, *Branan*, 851 F.2d at 1508 (claim that court misapplied state sentencing guidelines not cognizable on habeas review).

However, though the Court finds that the Michigan Court of Appeals' decision in this

_____

*Djoumessi v. Wolfenbarger*, No. 05-70455, 2007 WL 2021837 (E.D.Mich. July 12, 2007) (Tarnow, J.); *Carattoni v. Stovall*, No. 07-11910, 2007 WL 1976459 (E.D.Mich. July 3, 2007) (Steeh, J.); *Jackson v. Curtin*, No. 06-13338, 2007 WL 1675296 (E.D.Mich. June 11, 2007) (Edmunds, J.); *Davis v. Lafler*, No. 05-60271, 2007 WL 1582221 (E.D.Mich. May 31, 2007) (O'Meara, J.); *Coffel v. Stovall*, No. 07-11927, 2007 WL 1452918 (E.D.Mich. May 15, 2007) (Ludington, J.); *Conner v. Romanowski*, No. 05-74074, 2007 WL 1345066 (E.D.Mich. May 4, 2007) (Battani, J.); *Hall v. Lafler*, No. 05-73906, 2007 WL 1017036 (E.D.Mich. Apr. 2, 2007) (Zatkoff, J.); *Bell v. Booker*, No. 07-11070, 2007 WL 869169 (E.D.Mich. Mar. 22, 2007) (Taylor, J.) (all unpublished).

case is not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, the Court notes that, regarding the sentencing issue in this case, the trial-court judge should have exercised considerably more restraint in the administration of his courtroom. The trial judge's comments at sentencing indicated that that judge had strong views and had substantial difficulty in putting aside those views. The Michigan Court of Appeals correctly remanded for re-sentencing in order to preserve the appearance of fairness and justice.

Against that backdrop, the Court finds that the Michigan Court of Appeals' decision regarding Petitioner's sentencing issue is not contrary to, or an unreasonable application of, federal law or Supreme Court precedent. The Court therefore concludes that Petitioner is not entitled to habeas relief on his sentencing-guidelines claim.

### V.  Conclusion

For the reasons stated above, this Court concludes that Petitioner is not entitled to federal- habeas relief on the claims presented in his petition.

Accordingly:

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED WITH PREJUDICE**.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  October 27, 2008

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on October 27, 2008, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager